IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

CAROLYN JONES                                                              PLAINTIFF

VS.                              CASE NO. 07-CV-1089

CONAGRA POULTRY COMPANY
and PILGRIM'S PRIDE, INCORPORATED                                          DEFENDANTS

**MEMORANDUM OPINION**

Before the Court is Defendants' refiled Motion for Summary Judgment.  (Doc. No. 16). The Plaintiff has responded.  (Doc. No. 21).  Defendants have filed a reply to Plaintiff's response.  (Doc. No. 24).  The matter is ripe for consideration.

BACKGROUND

Carolyn Jones is African-American.  She is a former employee of Defendant ConAgra Poultry Company.  On October 25, 1994, Carolyn Jones was hired by ConAgra at its chicken processing plant in El Dorado, Arkansas.  Jones worked at the plant until August 13, 2003, when she quit because of medical problems.[1]  During her nine year tenure at the plant, Jones worked several jobs.  However, she worked primarily in the marination department in second processing where she placed chicken tenders on trays.

ConAgra maintained an anti-discrimination policy at the plant.  The policy prohibited

---

[1] On or about November 24, 2003, Pilgrim's Pride purchased ConAgra Poultry Company and its processing plant in El Dorado.  At the time of the acquisition, Jones was no longer employed by ConAgra.  Therefore, Jones was never an employee of Pilgrim's Pride. Because of the acquisition, Pilgrim's Pride has been named a defendant in the action.

intimidation, harassment and hostile acts against its employees. It provided a mechanism for reporting complaints. Jones knew of this procedure and the company's confidential 1-800 hotline for reporting any work related problems.

Jones belonged to the United Food and Commercial Workers Union Local 2008, the Union at the plant. As a Union member, Jones could utilize the collective bargaining agreements' grievance procedure to file complaints about aspects of her employment, including any racial discrimination and/or harassment. The grievance procedure consisted of four steps through which the complaining employee and the company would attempt to resolve the dispute. If a resolution could not be reached after the third step, the employee could take the complaint to binding arbitration. Jones was aware of the Union's grievance procedure.

During Jones's tenure at ConAgra, all production employees in the main plant were required to use the bathroom located next to the break room. During their break, employees – African-American, Caucasian and Hispanic – would have to stand in line waiting to get into the bathroom. Jones complains that most of the people standing in this line were African-American. However, she admits that since most of the plant employees were African-American you would expect that most of the people standing in line would be African-American.

The walls of bathroom used by the production workers were defaced with sexual and racial graffiti. The graffiti never referred to Jones by name or threatened her physically. The presence of the graffiti did not affect Jones's ability to do her job. Jones mainly complains that the bathroom was dirty and the roof leaked when it rained. She complained to John Kjeldgaard, the plant's human resource director, that the bathroom was filthy. Sometime before 2003, the bathroom in question was repainted and remodeled.

Production employees were required to receive a line pass from their coordinator or their supervisor in order to leave the line while the line was running. Jones claims that this was discriminatory. However, she admits that all production employees, African-American, Caucasian and Hispanic, were required to get such approval before leaving the line.

Production employees were not allowed to use the bathroom in the personnel department. The use of this bathroom was restricted to employees from that department and the nurse's office. This bathroom was cleaner and nicer than the one in the plant that was used by the production employees. Jones claims that this bathroom was for whites only. She does not know if the African-American employee in personnel used this restroom or not. However, Jones does admit that she used this bathroom once when she was in the nurse's office sick.

Sometime before 2000, Jones heard Granville Record, a Caucasian supervisor from another area, call an employee who was walking through her work area a "nigger." The remark was not directed at Jones. Jones admits that no supervisor ever directed any type of racial slur at her and she never heard any racial slurs from any of her supervisors. Jones also heard Record yell and curse at employees. However, he never yelled or cursed at Jones.

During her time in the marination department, Jones was supervised by Hazel Veasey, an African-American, Buddy Wesson, a Caucasian, Willie Reddeous, an African-American, and Kevin Arrington, a Caucasian. Hazel Veasey was Jones's coordinator. Buddy Wesson was her supervisor for a time. About a year before Jones left ConAgra, Kevin Arrington replaced Buddy Wesson as Jones's supervisor. Willie Reddeou was Jones's superintendent. Jones claims that her Caucasian supervisors, Buddy Wesson and Kevin Arrington, treated her like a child.

Jones claims that while Buddy Wesson was her supervisor, he would sometimes come

into the department and curse at the workers if everything was not going right.  He would curse at everyone in the department, not just one person in particular.  At the time, there were no Caucasians working in Jones's department.  Therefore, the employees whom Wesson cursed at were all African-American.  He would not make any racial slurs or use racially derogatory language during these outbursts.  Rather, he would say things like, "Y'all not doing this so and so "S" right."  Jones told the Union steward about Wesson's behavior but she did not file a grievance regarding it.

On July 5, 2001, again while Wesson was Jones's supervisor, she left the line to replace her apron, which had ripped.  On her way to the supply room, Wesson approached Jones and started yelling at her to return to her position on the line and get back to work.  Wesson then turned Jones around and started pushing her in the back saying, "Go on. Go on."  Thereafter, Jones returned to the line to work.

Jones filed a Union grievance regarding the incident.  Jones took her grievance through the third step of the Union's grievance procedure.  After that step, Wesson apologized to Jones.  Jones states that the grievance was not resolved to her satisfaction.  However, she did not take it to the fourth step and binding arbitration.

Sometime in 2002, Kevin Arrington replaced Buddy Wesson as Jones's supervisor.  While Arrington was Jones's supervisor, he would sometimes have to tell Jones and the other workers to get on the line and get to work.  He would do this by saying, "Y'all, girl, get your asses on the belt and do your work."  He would not make any racial slurs or use any racially derogatory language during these outbursts.

In October 2002, Jones injured her back while on the line putting chicken tenders on

trays.  The next day, Jones went to the nurse's office.  She was given medication and a hot pad.  Thereafter, Jones went to the nurse's office almost every morning where she received medication and heating pad theory.  Eventually, the nurse sent Jones to the doctor for her back.

The doctor placed Jones under work restrictions.  She could not lift, push, or pull over five pounds.  He also recommended that she work in a position requiring minimal axial movement.  Thereafter, Jones worked under these work restrictions.  Later, Jones's work restrictions were increased by the doctor to no lifting over two pounds and no kneeling or squatting.  Jones continued to work under these more stringent work restrictions.  At some point, Jones was placed on light duty.  This consisted of sitting in the break room and performing odd jobs, if any, that were brought to her.

One day, while Jones and another African-American woman were sitting in the break room on light duty, Shelia Bagley, a Caucasian supervisor from another area, came into the break room.  Bagley told Jones and the other woman to get back to work.  She did so by saying, " You all need to go back to from where you came from."  Bagley then said, "Well, you come on and go with me, and we're going to go to work.  I'm going to put you all to work.  Y'all are not going to sit in here all day and do nothing."  Bagley then took the women back to the line to work.  Jones considered this statement to be racist because she believed that Bagley was referring to Africa when she told them they needed to go back to where they came from.

Jones worked on the line until her break.  At break, Jones went to the nurse's office and told her what happened.  The nurse explained to Jones that she had not told Bagley about Jones's work restrictions.  She told Jones that she would talk to Bagley immediately.  The nurse then sent Jones back to the break room.  At some point, Jones went to the Human Resources Department

and complained to John Kjeldgaard about Bagley's treatment of her. Jones never had any other problems with Bagley saying anything to her that she considered racist or sending her back to the line to work.

Jones continued on light duty until June 11, 2003. On that day, she was told that she would start drawing Workman's Comp and was sent home. Thereafter, Jones began receiving Workman's Compensation payments. Sometime during the summer, Jones had back surgery. On August 13, 2003, Jones called the plant and told someone in personnel that she would not be returning to work because of medical reasons.

On December 22, 2003, Jones, along with seven other employees, filed a class action lawsuit against ConAgra and Pilgrim's Pride.[2] In the Class Action Complaint, Jones alleged that she had been subjected to racial discrimination at the El Dorado plant. She claimed that the discrimination was in the form of disparate treatment, wrongful termination, failure to promote and a hostile work environment in violation of 42 U.S.C. § 1981 and the Arkansas Civil Rights Act of 1993.

On July 25, 2005, the Defendants moved for summary judgment on all of Jones's claims. In her response, Jones stated that she was not maintaining a wrongful termination claim, a failure to promote claim, or a disparate treatment claim against the Defendants. Therefore, on March 28, 2006, the Court granted summary judgment as to Jones's claims for disparate treatment, wrongful termination and failure to promote. Summary judgment was denied as to Jones's hostile work environment claim on the grounds that merits-based discovery had not begun. The

---

[2] By this time, Pilgrim's Pride had purchased ConAgra Poultry Company and its chicken processing plant in El Dorado.

Court ruled that the motion was premature. It also ruled that it could be refiled at a later date.

On May 15, 2007, the Court denied the Plaintiffs' Motion for Class Certification. Thereafter, the parties agreed that each class representative would proceed with their individual claims in separate lawsuits under newly assigned case numbers. The parties also agreed that no additional discovery was needed and that the Defendants could refile their previously filed summary judgment motions against the individual plaintiffs.

On September 19, 2007, Jones filed her individual Complaint against the Defendants. On November 2, 2007, Jones amended the Complaint. In her Amended Complaint, Jones alleges that the Defendants discriminated against her because of her race in violation of 42 U.S.C. § 1981 and the Arkansas Civil Rights Act of 1993 ("ACRA"), Ark. Code Ann. § 16-123-102, 107. Specifically, Jones claims that she was subjected to a hostile work environment. The matter is now before the Court on Defendants' refiled Motion for Summary Judgment.

## STANDARD OF REVIEW

The standard of review for summary judgment is well established. The Federal Rules of Civil Procedure provide that when a party moves for summary judgment;

> The judgment sought shall be rendered forthwith if the pleadings, dispositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c); *Krenik v. County of LeSueur,* 47 F.3d 953 (8th Cir. 1995). The Supreme Court has issued the following guidelines for trial courts to determine whether this standard has been satisfied:

> The inquiry performed is the threshold inquiry of determining whether there is a need for trial–whether, in other words, there are genuine factual issues that properly

>  can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.,* 447 U.S. 242, 250 (1986). *See also Agristor Leasing v. Farrow,* 826 F.2d 732 (8th Cir. 1987); *Niagara of Wisconsin Paper Corp. v. Paper Indus. Union-Management Pension Fund,* 800 F.2d 742, 746 (8th Cir. 1986). A fact is material only when its resolution affects the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248. A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *Id.* at 252.

The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enterprise Bank v. Magna Bank,* 92 F.3d 743, 747 (8th Cir. 1996). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id.* The nonmoving party must then demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of LeSueur,* 47 F.3d at 957. A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 256.

DISCUSSION

In her Amended Complaint, Jones alleges that she was subjected to a hostile work environment when she was subjected to abusive language at the plant, witnessed racial graffiti on the bathroom walls and witnessed African-American employees being treated differently than Caucasian employees in that African-Americans were treated in a disrespectful manner. She

claims that this discrimination was in violation of 42 U.S.C. § 1981 and the Arkansas Civl Rights Act of 1993 ("ACRA"), Ark. Code Ann. § 16-123-102, 107.

In employment discrimination cases under 42 U.S.C. § 1981 and the ACRA, the courts apply the familiar three-step burden shifting framework set out in *McDonnell Douglas Corp. v. Green,* 41 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Putman v. Unity Health Sys.,* 348 F.3d 732, 735 n.2 (8th Cir. 2003)(applying *McDonnell Douglas* to § 1981 claim); *Crone v. United Parcel Serv., Inc.,* 302 F.3d 942, 945 (8th Cir. 2002) (applying *McDonnell Douglas* to ACRA claim). Under *McDonnell Douglas,* the plaintiff must first establish a *prima facie* case of discrimination. If the plaintiff is able to do this, the burden of production then shifts to the defendant to assert a legitimate non-discriminatory reason for the alleged discrimination. If the defendant sets forth such a reason, the burden then shifts back to the plaintiff to establish that the asserted reason was merely a pretext for discrimination. The Court will review each of Jones's claims in light of the above burden shifting framework.

Jones claims that she was subjected to a hostile work environment during her tenure at the plant. In order to establish a racially hostile work environment claim, an employee must show that: 1) she was a member of a protected group; 2) she was subjected to unwelcome race-based harassment; 3) the harassment was because of her membership in the protected group; and 4) the harassment affected a term, condition, or privilege of her employment. *Elmahdi v. Marriott Hotel Services, Inc.,* 339 F.3d 645 (8th Cir. 2003). Harassment which is severe and pervasive is deemed to affect a term, condition, or privilege of employment. *Elmahdi,* 339 F.3d. at 652. The conduct must be severe "as it would be viewed objectively by a reasonable person and as it was actually viewed subjectively by the victim." *Id.* (quoting *Howard v. Burns Bros.,*

*Inc.,* 149 F.3d 835, 840 (8th Cir. 1998)).  Merely feeling offended, however, does not sufficiently affect the conditions of employment to support a claim.  *Id.,* 339 F.3d at 653 (citing *Harris v. Forklift Sy*s*., Inc.,* 510 U.S. 17, 21 (1993)).  In determining whether sufficient evidence of a hostile work environment claims has been presented, courts consider all the attendant circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance.  *Elmahdi,* 339 F.3d. at 652-53.  To satisfy the high threshold of actionable harm, the employee must show that his workplace was permeated with discriminatory intimidation, ridicule and insult.  *Elmahdi,* 339 F.3d. at 653.

### *Abusive Language at the Plant*

Jones claims that she was subjected to a hostile work environment by the Defendants when she was subjected to abusive language at the plant.  There is not doubt that Jones is a member of a protected group–African American.  Thus, she can establish the first element of her *prima facie* case of hostile work environment.  However, the Defendants contend that Jones can not show the other elements of her *prima facie* case–that she was subjected to unwelcome race-based harassment, that the alleged harassment was because of her membership in the protected group and that it affected a term, condition, or privilege of her employment.

In support of her claim, Jones states that she heard two racial slurs during her nine year tenure at the plant.  The first occurred sometime before 2000 when she heard Granville Record, a Caucasian supervisor from another department, call an employee who was walking through her work area a "nigger."  The second racial slur occurred when Shelia Bagley, another Caucasian supervisor from another department, told Jones and another African-American woman to get back

10

to work by saying, "You all need to go back to from where you came from." Jones considered this comment to be racist because she believed Bagley was referring to Africa.

Two racial slurs in a nine year period are not severe or pervasive enough to create a hostile work environment. *Woodland v. Joseph T. Ryerson & Son, Inc.,* 302 F.3d 839, 844 (8th Cir. 2002). While offensive, these comments would not be viewed by a reasonable person as hostile. *See Singletary v. Mo. Dep't of Corrs.,* 423 F.3d 886, 893 (8th Cir. 2005). Such offhand comments and isolated incidents will not amount to a discriminatory change in the terms or conditions of employment. *Wallin v. Minnesota Dept. of Corrections,* 153 F.3d 681, 688 (8th Cir. 1998). They do not constitute a "steady barrage of opprobrious racial comment." *Elmahdi,* 339 F.3d at 653 (quoting *Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1257 (8th Cir. 1981)). Thus, the two incidents of which Jones complains are not sufficient to support her claim of a hostile work environment.

Next, Jones claims that her Caucasian supervisors, Buddy Wesson and Kevin Arrington, would yell and curse at the employees in the marination department. She states that the outbursts would occur when things were not going right or they wanted the workers to get to work. These outbursts did not contain any racial slurs or any racially derogatory language. Rather, the supervisors would say things like, "Y'all not doing this so and so "S" right" and "Y'all, girl, get your asses on the belt and do your work."

There was nothing inherently racial about these outbursts. Thus, even thought the employees working in the marination department were predominately African-American, there is no evidence that the supervisors' outbursts were motivated by or based upon their race. *See Schoffstall, v. Henderson,* 223 F.3d 818, 826 (8th Cir. 2000). There is also no evidence regarding

the frequency of these outbursts.  Offhand comments and isolated incidents will not amount to a discriminatory change in the terms or conditions of employment.  They are not severe or pervasive enough to create a hostile work environment.  While offensive, Wesson's and Arrington's outbursts are not sufficient to support Jones's claim of a hostile work environment.

 Jones next claims that her supervisor, Buddy Wesson yelled at her one time when he wanted her to get back on the line.  Wesson turned Jones around, pushed her in the back and yelled at her, saying "Go on. Go on."

 This isolated incident does not amount to a discriminatory change in the terms or conditions of Jones's employment.  Wesson did not use racial slurs or any racially derogatory language when addressing Jones.  There is simply no evidence that Wesson's behavior was motivated by Jones's race.  *Schoffstall,* 223 F.3d at 826.  Therefore, his behavior is not sufficient to support Jones's claim of a hostile work environment.

 Finally, Jones claims that she overheard Granville Record yelling and cursing at other employees.  Record was not Jones's supervisor and he never yelled or cursed at her.  In fact, Jones admitted that she did not know who he was until she asked a co-worker.

 While such behavior may be inappropriate, it is not what a reasonable person would consider hostile.  It was not directed at Jones and there is no evidence that it unreasonably interfered with her work performance.  It was not so severe or pervasive as to affect a term or condition of Jones's employment.  Thus, it is not sufficient to support Jones's claim of a hostile work environment.

 The discrimination laws are not a general civility code.  Thus, the abusive language of which Jones complains is not what a reasonable person would consider harassment.  It was not

severe or pervasive enough to amount to a discriminatory change in the terms and conditions of Jones's employment. Thus, Jones has failed to establish a *prima facie* case of hostile work environment in connection with abusive language at the plant. Accordingly, the Court finds that this claim must fail as a matter of law.

### *Racial Graffiti in the Bathroom*

Next, Jones contends that the presence of racial graffiti on the bathroom walls at the plant created a hostile work environment for her. However, Jones seems to be much more concerned with the cleanliness of the bathroom than the graffiti on the walls. She complained to John Kjeldgaard, the human resources director, about the bathroom being dirty, not about the graffiti on the walls. She admits that the bathroom was repainted and remodeled before he quit in 2003. Jones also states that the presence of this graffiti did not affect her ability to do her work.

In this instance, the graffiti was not specifically directed at Jones. It did not physically threaten her. It did not affect her ability to do her work. It was painted over by the Defendants. It is apparent that the presence of graffiti on the walls in the plant's bathroom was not sufficiently severe or pervasive enough to affect the terms and conditions of Jones's employment. *See Woodland,* 302 F.3d at 843-44. Thus, Jones has failed to establish a *prima facie* case of a hostile work environment in connection with the presence of graffiti in the bathroom. Accordingly, the Court finds that this claim must fail as a matter of law.

### *African-American Employees treated Disrespectfully*

Finally, Jones claims that she was subjected to a hostile work environment when she witnessed African-American employees being treated differently than Caucasian employees in that they were being treated in a disrespectful manner. In support of this contention, Jones first

claims that African-American production employees had to stand in line waiting to get into the bathroom during their break time.  However, all production employees –African-American, Caucasian and Hispanic–had to stand in the same line to get into the bathroom during break.  She claims that African-American production employees were required to get a line pass from a supervisor in order to leave the line while it was running.  However, all production employees–African-American, Caucasian and Hispanic–had to get the same line pass before leaving the line while it was running.  Finally, Jones claims that African-American production employees  were not allowed to use the bathroom in the personnel department/nurses's office.  However, Jones admits that she was allowed to use this bathroom once while she was in the nurse's office sick.  The evidence simply does not support Jones's claim that African-American employees were treated differently in terms of respect and witnessing such created a hostile work environment for her.  Thus, Jones has failed to establish a *prima facie* case of hostile work environment in this regard.  Accordingly, the Court finds that this claim must fail as a matter of law.

## CONCLUSION

For the reasons discussed herein above, the Court finds that Defendants' Motion for Summary Judgment should be and hereby is **granted**.  A judgment of even date, consistent with this Opinion, will be issued.

IT IS SO ORDERED, this 30th day of September, 2008.

    /s/Harry F. Barnes
    Hon. Harry F. Barnes
    United States District Judge